E-FILED
Monday, 25 January, 2016 03:54:39 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In re CENTRAL ILLINOIS ENERGY COOPERATIVE, | ) ) ) |
| Debtor, | ) ) ) |
| A. CLAY COX, not individually but as trustee for the estate of Central Illinois Energy Cooperative, | ) ) ) ) ) |
| Plaintiff/Appellant, | ) ) |
| v. | ) )   Case No. 15-1118 |
| NOSTAW, INC., an Illinois corporation, | ) ) ) |
| Defendant/Appellee. | ) ) |

## ORDER AND OPINION

This matter is now before the Court on Trustee for Central Illinois Energy Cooperative's appeal from the November 2014 Order and Opinion and March 2015 Affirmance issued by United States Bankruptcy Judge Thomas Perkins. That Order denied Appellant's partial motion for summary judgment and granted Defendant Appellee Nostaw's cross motion for summary judgment. For the reasons set forth below, this Court Affirms the Bankruptcy Judge's grant of summary judgment in favor of Nostaw.

### Background

Central Illinois Energy Cooperative (the "Coop" or "the Debtor") was formed by a group of farmers in October 2001 for the purpose of constructing and operating an ethanol facility for the processing of its members' corn into ethanol. In March 2004 Central Illinois Energy, LLC ("CIE") and Central Illinois Holding Company, LLC ("HoldCo") were formed. The Coop owned

a 71% interest in HoldCo, and CIE was a wholly owned subsidiary of the holding company. CIE was formed to construct and operate the ethanol production plant; the Coop was responsible for construction of the adjacent grain handling facility. In March 2005 the Coop contracted with Nostaw, the general contractor, to construct the grain handling facility for $5.4 million. In order to partially finance the grain handling facility construction, the Coop borrowed $2 million from Whitebox CIE Pledgors, Inc., evidenced by a note requiring payment in full on May 17, 2007. By June of 2007, both the CIE ethanol facility construction and the Coop grain handling facility construction were facing financial difficulties. The Coop was unable to pay the Whitebox note when it became due, and was unable to pay the invoices from Nostaw, who was owed $2,490537.67 and contemplating ceasing work on the project and filing a lien.

On June 12, 2007, the Coop sold almost all of its assets, including the unfinished grain handling facility, to Green Lion Bio-Fuels, LLC for $7.75 million, subject to a repurchase obligation (the "Green Lion Purchase Agreement"). Green Lion agreed to assume the Coop's liabilities to Nostaw ($976,295.67 and $258,777.83) and another contractor ($251,722.29) in order to offset the purchase price. Under the Green Lion Purchase Agreement, the Coop remained responsible for the construction and completion of the grain handling facility, while Green Lion, through its lender Ridgestone Bank, was responsible for construction pay requests. Nostaw was not a party to the Purchase Agreement.

A separate agreement, the Green Lion Payment Agreement, was entered into between the Coop, Green Lion, and Nostaw on the same date. Under the Payment Agreement, Nostaw agreed to accept as full payment of its contract: (1) $1,236,857.33 in cash from the Coop at the close of Green Lion's purchase; (2) $258,777.83 in cash from Green Lion as progress payments; and (3) a promissory note from Green Lion for $976,295.67 with a maturity date of October 15, 2007,

secured by a second mortgage on the grain handling facility. The promissory note included a 'best efforts" clause whereby Green Lion was to use its best efforts to pay down the note by August 15, 2007.

A third agreement, the Green Lion Recapitalization Agreement, was also executed on June 12, 2007. In that agreement, Green Lion agreed to transfer title to the assets purchased in the Green Lion Purchase Agreement to CIE for $7.75 million plus expenses. If CIE's recapitalization plan was not consummated by November 1, 2007, the Coop was required to repurchase the assets for the same price. Although Nostaw was not a party to the Recapitalization Agreement, it did execute a written consent that acknowledged the rights of CIE, and the conditional obligation of the Coop, to purchase the grain handling assets from Green Lion and to honor those rights and obligations in the event that Nostaw pursued foreclosure proceedings against Green Lion.

At closing, Nostaw was paid the $1,236,857.33 from the Coop as promised in the Green Lion Payment Agreement. Thereafter, Green Lion made one payment to Nostaw for $255,777.83 on August 24, 2007. In September 2007 Nostaw refused to complete work on the facility without further assurance of payment from Green Lion after it learned of Green Lion's prospective inability to pay the promissory note by the October 15, 2007, maturity date. In order to save the project, on September 28, 2007, the Coop agreed to assume to obligation to pay Nostaw the $988,859.83 it was owed in exchange for Nostaw continuing construction and completing the facility. The written agreement (the "September Agreement") called for the Coop to make a down payment of $300,000, with the balance to be paid as work progressed.  The Coop financed the September Agreement with a $1,000,000 loan from Whitebox Advisors and made three payments of $300,000 each on October 9, October 26, and November 23, 2007.

CIE ceased work on the ethanol plant and filed for Chapter 11 bankruptcy on December 13, 2007. An involuntary Chapter 11 petition was filed against the Coop on May 1, 2009 and was thereafter transferred to Chapter 7 in July of 2009. The Trustee brought an adversary proceeding to avoid and recover the $900,000 paid to Nostaw as actual or constructively fraudulent transfers. The first Count was brought under section 548(a) for actual or constructive fraud, the second and third Counts alleged actual or constructive fraud under the Illinois Uniform Fraudulent Transfer Act via section 544(b) of the Bankruptcy Code.

The Trustee sought partial summary judgment with respect to the constructive fraud allegations in Counts 1, 2, and 3; Nostaw filed a cross motion for summary judgment on all counts. The Bankruptcy Judge granted summary judgment to Nostaw on all counts. The Trustee then filed a motion to reconsider, and the Bankruptcy Court issued a second opinion affirming its earlier decision. This Opinion follows.

**Standard of Review**

This Court has jurisdiction to review the decision of the Bankruptcy Judge pursuant to 28 U.S.C. § 158(a). District courts apply a dual standard of review in bankruptcy appeals—the Bankruptcy Judge's findings of fact are reviewed for clear error, while conclusions of law are reviewed *de novo*. *In re Midway Airlines*, 383 F.3d 663, 668 (7th Cir. 2003); *In re Smith*, 286 F.3d 461, 464-65 (7th Cir. 2002). "As a conclusion of law, a grant of summary judgment by the bankruptcy court is therefore reviewed *de novo*." *In re Midway Airlines*, 383 F.3d at 668. A bankruptcy court's grant of summary judgment will be affirmed if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The reviewing court may affirm summary judgment "on any ground supported by the

record, even if it was not relied upon by the court below." *In re Midway Airlines*, 383 F.3d at 668; *Johnson v. Gudmundsson*, 35 F.3d 1104, 1115 (7th Cir. 1994).

## Issues Presented

The Trustee appeals the Bankruptcy Judge's grant of summary judgment in favor of Nostaw. Specifically, the issues presented are whether the Bankruptcy Judge erred in finding: (1) that the Trustee was time-barred from attempting to avoid the obligations incurred under the September Agreement, and avoidance of the obligation was necessary in order to avoid the payments made thereunder; (2) that the September agreement was supported by adequate consideration; and (3) that the Trustee was unable to establish that the Coop had not received reasonably equivalent value.

## Analysis

### (1) Trustee was Barred from Avoiding the September Agreement, and Avoidance of the Agreement was as a Prerequisite to Avoidance of the Transfers Under the Agreement

Section 548 of the Bankruptcy Code sets forth the trustee's avoidance powers for fraudulent transfers and obligations. It states:

> (a)(1) The trustee may avoid any *transfer* . . . of an interest of the debtor in property, or any *obligation* . . . incurred by the debtor, that was *made or incurred on or within 2 years before the date of the filing of the petition*, if the debtor voluntarily or involuntarily —
> (B)(i) received less than *a reasonably equivalent value* in exchange for such transfer or obligation; . . .
> 11 U.S.C. §548 (emphasis added)

Section 5 of the Illinois Uniform Fraudulent Transfers Act ("IUFTA") provides:

> § 5. (a) A *transfer* made or *obligation* incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a *reasonably equivalent value* in exchange for the transfer or obligation . . . .

5

> 740 Ill. Comp. Stat. Ann. 160/5 (emphasis added)

Section 6(a) of the IUFTA further provides:

> § 6. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
> 740 Ill. Comp. Stat. Ann. 160/6

In its November 2014 grant of summary judgment for Nostaw, the Bankruptcy Court rejected the Trustee's contention that the September Agreement could be avoided under either Section 548 of the Bankruptcy Code, or under the IUFTA through Section 544 of the Bankruptcy Code. See *In re Central Illinois Energy Co-op*, 521 B.R. 868, 874 (Bankr. C.D. Ill. 2014) ("The problem for the Trustee is that he has not filed a complaint seeking to avoid the [September] Agreement as fraudulent and the time for doing so has long since expired."). The Trustee moved for reconsideration, and the Bankruptcy again rejected Trustee's argument that the September Agreement was avoidable as a fraudulently incurred obligation. See *In re Central Illinois Energy Co-op*, 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015). In that opinion, the Bankruptcy Judge stated that "[i]t is widely recognized by courts that where a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation." *Id.*, citing *In re Tanglewood Farms, Inc. of Elizabeth City*, 487 B.R. 705, 710-11 (Bankr. E.D.N.C. 2013); *In re Incentium*, LLC, 473 B.R. 264 (Bankr. E.D. Tenn. 2012); *In re TSIC, Inc.*, 428 B.R. 103 (Bankr. D.Del. 2010); *In re All–Type Printing, Inc.*, 274 B.R. 316 (Bankr. D.Conn. 2002).

Trustee's argument on appeal is that it was not required to avoid the September Agreement in order to recover the $900,000 paid to Nostaw in October and November of 2007.

Specifically, the Trustee asserts that the four cases cited by the Bankruptcy Court do not support the conclusion that the September Agreement must have been avoided as a precondition to avoidance of the payments. A review of those cases follows.

*Tanglewood*

In the case of *In re Tanglewood Farms*, the debtor executed a $600,000 promissory note in favor of defendant Endcom, secured by an interest in debtor's harvested corn. 487 B.R. 705, 707-08 (Bankr. E.D.N.C. 2013). The proceeds of the loan were deposited into the personal account of Tanglewood's president and sole shareholder. The debtors made a $50,000 payment to Endcom a month later. However, Endcom was unaware that the debtors also sold the corn crop pledged as security for the note, the proceeds from which were not paid to Endcom. The debtor then filed a voluntary Chapter 11 petition which was later converted to Chapter 7. The trustee initiated an adversary proceeding to avoid the note and security agreement and recover the fraudulent transfers under Section 544, 548, 550, and 551 of the Bankruptcy code, together with North Carolina's version of the UFTA. *Id*. at 708.

Addressing the defendant's motion to dismiss, that court found that the debtor did not receive reasonably equivalent value for the note because the proceeds of the loan were not distributed to Tanglewood, Inc., but rather to the personal bank account of Tanglewood's president and sole shareholder. *Id*. at 711. Because the note was not given in exchange for reasonably equivalent value, the trustee sufficiently pleaded the requirements to avoid the obligation as fraudulent. And because the obligation was avoidable, "the debtor's payment to the defendant was for less than reasonably equivalent value because the debt itself may be avoided and, therefore, eliminated." *Id*. at 713.

Trustee contends that nothing in *Tanglewood* indicates why the *Tanglewood* trustee sought to avoid the note and security agreement, and nothing in the opinion held that it was necessary to avoid the note in order to avoid the payments made thereunder. However, the *Tanglewood* court stated, "[a]lthough the defendant asserts that this payment was a partial repayment of an antecedent debt, where the underlying obligation or debt has been avoided, any payments on account thereof could no longer be supported by the value of debt satisfaction since no debt would exist." *Id*. at 712-13, citing *TSIC, Inc. v. Thalheimer*, 428 B.R. 103, 115 (Bankr. D.Del. 2010). Thus, without avoidance of the underlying obligation, "the dollar-for-dollar discharge of indebtedness" is, *ipso facto*, for "value." *In re Central Illinois Energy Co-op*, 521 B.R. at 874; see 11 U.S.C. § 548 ("'value' means property, *or satisfaction or securing of a present or antecedent debt of the debtor*, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor"). Therefore, *Tanglewood* supports the Bankruptcy Court's conclusion that avoidance of the September Agreement was a precondition to avoiding the payments to Nostaw under that agreement.

*TSIC*

The Trustee also claims that the Bankruptcy Court erroneously relied on *In re TSIC, Inc.* to support its conclusion that avoidance of the September Agreement was necessary in order to avoid the payments to Nostaw. 428 B.R. 103 (Bankr. D.Del 2010). Specifically, the Trustee claims in his brief that "*TSIC* unquestionably demonstrates that a trustee's failure to expressly challenge an unenforceable agreement which is the 'source' of a fraudulent conveyance does not bar a trustee's right to recover the payments made pursuant to that unenforceable agreement." While that proposition may be factually correct, it stands for nothing more than the platitude that

8

an unenforceable agreement need not be avoided because it is unenforceable. Moreover, Trustee's characterization of *TSIC* directly conflicts with the actual text of the case:

> Unlike the trustee in *All–Type,* the Debtor in this case *seeks to avoid both the transfer and the obligation* and is within its rights to do so under Section 548. Debtor can avoid the underlying obligation thereby effectively eliminating the debt. Because no debt existed, Debtor's transfer of Thalheimer's severance payment was for less than reasonably equivalent value.
> *In re TSIC, Inc.*, 428 B.R. 103, 115 (Bankr. D. Del. 2010) (emphasis added).

*Incentium*

The Trustee makes a similar argument regarding the Bankruptcy Court's reliance on *In re Incentium, LLC*, 473 B.R. 264 (Bankr. E.D. Tenn. 2012). In that case, the defendant was hired by the debtor, Incentium, as its CEO and president. The employment agreement of October 2008 provided for a base salary of $250,000 per year, and further provided that if defendant was terminated without cause he would be entitled to continue receiving his salary for six months. *Id*. at 265. Defendant was subsequently terminated without cause, and debtor and defendant signed a termination agreement in March 2010 providing for the same termination benefits stated in the employment agreement. After defendant received about $104,000 in severance payments, an involuntary Chapter 7 petition was filed against the debtor in February 2011 where the plaintiff sought to avoid the separation agreement as a fraudulently incurred obligation and to avoid the severance payments as fraudulent transfers. *Id*. at 267.

On cross-motions for summary judgment, the *Incentium* court concluded that because "the severance obligation in the Separation Agreement was the same severance obligation created by the original Employment Agreement," it was "not changed to a different severance obligation within two years of the debtor's bankruptcy filing that could be avoided on grounds that reasonably equivalent value was not received by the debtor." *Id*. at 272. Therefore, the court concluded, the obligation was not avoidable under §548(a)(1)(B)(ii)(IV). Because the underlying

9

obligation was unavoidable, "the transfers of severance pay to the defendant satisfied the prior, unavoidable severance obligation, so the debtor received 'value' in exchange for the transfers." *Incentium*, 473 B.R. at 272. Therefore, "[i]t follows that the severance payments are not avoidable either." *Id*. Again, Trustee's characterization of *Incentium* as "lending no support" to the Bankruptcy Court's conclusion that the Trustee was obligated to set aside the September Agreement before seeking recovery of the transfers is without merit.

   *All-Type*

   Finally, the Trustee takes issue with the Bankruptcy Court's reliance on *In re All–Type Printing, Inc.*, 274 B.R. 316 (Bankr. D.Conn. 2002). In that case, the trustee for All-Type attempted to avoid payments All-Type made to a retired shareholder under a retirement agreement. *Id*. at 319-21. That court held that the trustee lacked standing to avoid the payments because it failed to show that All-Type had at least one creditor at the time of each payment. *Id*. at 323-24. Moreover, even if the trustee could establish standing, "he would still be unable to avoid them since they were supported by "reasonably equivalent value." *Id*. at 324. The court reasoned that in each of the payments, "All-Type made [a] Payment to or for the benefit of [retired shareholder], and received in exchange a dollar-for-dollar satisfaction of the Retirement Debt." Because satisfaction of an antecedent debt was explicitly acknowledged as value for Connecticut's fraudulent transfer analysis, "the individual satisfactions flowing from each Payment provided 'reasonably'—indeed, perfectly—equivalent value in exchange for such Payment." *Id*. Finally, the court noted that its conclusion was premised on the fact that All-Type's obligation under the retirement agreement had not been avoided, and that the analysis would have been different "had the Trustee also sought and obtained an avoidance of the

10

incurring of that obligation." *Id*. Had the obligation been avoided, "the Payments could no longer be supported by the value of debt satisfaction since no debt would exist." *Id*.

Here, Trustee insists that "it is unclear how the court's analysis or the result would have differed had the trustee challenged the settlement agreement as opposed to the individual payments." To the contrary, the *All-Type* opinion clearly stated that if the retirement agreement been avoided, any payments made thereunder could not be supported by the value of debt satisfaction because no debt would exist. *Id*. In sum, *All-Type*, like *Incentium*, *TSIC*, and *Tanglewood*, all supported the Bankruptcy Court's conclusion that Trustee could not avoid the payments made to Nostaw—payments representing a dollar-for-dollar discharge of debt—without first avoiding the September Agreement itself.

**(2) The September Agreement was Supported by Consideration**

Because the Trustee was time barred from avoiding the agreement as a fraudulently incurred obligation by asserting its avoidance powers under Section 544 or 548, the Bankruptcy Court found that the Trustee's power to challenge the agreement "necessarily arises under Section 541." *In re Central Illinois Energy Co-op*, 526 B.R. 786, 791-92. Section 541 defines the property accruing to the estate; thus, the rights and claims held by the trustee as successor to the debtor's interests included as property of the estate include all rights the debtor may have under and arising from its contracts. *Id*.; 11 U.S.C. § 541. In contrast to the trustee's avoidance powers under Sections 544 or 548 of the Bankruptcy Code, the trustee's rights under Section 541 are derivative of those held by the debtor—he cannot assert greater rights than the debtor had on the day the bankruptcy case was commenced. *Id*., citing *In re Majestic Star Casino, LLC*, 716 F.3d 736, 748 (3d Cir. 2013); 11 U.S.C. §§ 541, 544. And since the trustee "stands in the debtor's shoes," a trustee "asserting a debtor's rights under Section 541 is subject to the same defenses as

could have been asserted by the defendant had the action been instituted by the debtor." *In re Central Illinois Energy Co-op*, 526 B.R. at 792, citing *In re Derivium Capital LLC*, 716 F.3d 355, 367 (4th Cir. 2013).

The Bankruptcy Court framed the consideration issue as "whether the Debtor would have prevailed in an action against Nostaw to have a court declare the [September] Agreement unenforceable for want of consideration, based upon the facts as they existed on the date of the order for relief, taking into account any defenses then available to Nostaw." *In re Central Illinois Energy Cooperative*, 526 B.R. at 792. The Bankruptcy Court concluded that the September Agreement was a valid bilateral contract supported by consideration in the form of mutual and concurrent promises between the Coop and Nostaw, and thus enforceable under Illinois law. Further, the court noted that under Illinois law, even if adequate consideration was absent, the Coop could not have succeeded in setting aside the obligation to pay Nostaw after accepting Nostaw's performance. Because the Coop would have been unsuccessful in challenging the enforceability of the September Agreement, and the Trustee stands in the shoes of the Debtor, the Bankruptcy Court held that the Trustee could not succeed in attacking the Agreement for lack of consideration. *Id*. at 798.

The Trustee argues that the September Agreement was not supported by consideration because the Coop was merely agreeing to pay Green Lion's antecedent debt. In support of this argument, the Trustee claims that (1) Nostaw's promise to the Coop to complete the Grain Handling Facility was not new consideration because it was already obligated to Green Lion for the same; (2) the $976,000 note was for work already performed as of June 12, 2007, the date of the Green Lion Payment Agreement; and (3) the note was not yet due at the time the Coop entered into the September Agreement with Nostaw.

At the time of the Green Lion Payment Agreements, Nostaw was owed $2,490,537. Under the Green Lion Payment Agreement, Nostaw received: $1,236,847 from the Coop at the time of the agreement; a secured promissory note in the principal amount of $976,295 whereby Green Lion was to use its best efforts to pay the note by August 15, 2007, with full payment due on October 15, 2007; and $258,777 in progress payments. The agreement also required Green Lion to make payments to Nostaw within ten days of receipt of an invoice. Green Lion breached this requirement on at least four invoices when it did not pay Nostaw for work invoiced on June 28 and July 16 until July 30, 2007. Nostaw's attempts to collect the $258,777 in progress payments under the Green Lion Payment Agreement also went unanswered until Green Lion tendered $255,777.83 on August 24, 2007. Although Green Lion was to use its best efforts to pay down the note by August 15, 2007, Nostaw only received $8,193.32 from Green Lion by that date. More significantly, in September 2007 Nostaw demanded—and Green Lion refused to provide—further assurance of payment. As a result of Green Lion's stated inability to pay, Nostaw threatened to case work on the grain handling facility.

"A breach occurs when it is reasonably certain that the other party is not going to meet its obligations under the contract in timely fashion." *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 919 (7th Cir. 2001). Green Lion's late payments, failure to make material progress in paying down the note by the August 15, 2007 "best efforts" date, and inability to pay or provide further assurances of payment to Nostaw indicated with reasonable certainty that Green Lion was not going to meet its obligations under the contract in a timely fashion. *Id*. Because Green Lion was in breach of its contractual duties, Nostaw was "freed from its own contractual obligations and authorized to take reasonable self-protective measures . . .

13

[Nostaw] is not required to twiddle its thumbs . . . while the prospects of recovering what it is owed ooze away." *Id*. Thus, Nostaw was within its rights to stop construction on the facility.

In order to assure timely completion of the grain handling facility, the Coop re-obligated itself to Nostaw for $988,859 in exchange for Nostaw's promise to complete the grain handling facility. "Valuable consideration for a contact consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." *In re Central Illinois Energy Co-op*, 526 B.R. 786 (Bankr. C.D. Ill. 2015) citing *Dohrmann v. Swaney*, 2014 IL App (1st) 131524. The Coop's promise of payment and Nostaw's promise of performance represented a bargained-for exchange of mutual promises sufficient to form consideration to support a contract. As the Bankruptcy Court correctly noted, even if the Coop received nothing of value from Nostaw, consideration would still be present so long as Nostaw promised some forbearance, detriment, loss or responsibility. *In re Central Illinois Energy Co-op* at 796.

The Trustee's contention that the Coop did not receive value for the September Agreement because Green Lion—and not the Coop— owned the grain handling facility overlooks the terms of the Recapitalization Agreement and the Coop's interest in its timely completion. While it is true that Green Lion owned the grain handling facility at the time, the Recapitalization Agreement provided CIE with the right, and the Coop with the conditional obligation if CIE was not recapitalized by November 1, 2007, to repurchase the assets upon completion of the facility. The Coop had a strong interest in having the facility completed as soon as possible: CIE would not be able to operate the ethanol production and power plant until the grain handling facility was completed. CIE, a wholly owned subsidiary of HoldCo, of which the Coop owned a controlling 71% interest, financed the construction of the ethanol production

14

plant with loans exceeding $87,500,000. In order for the Coop's grain handling facility—and by extension CIE's ethanol facility—to begin to generate revenue, both facilities needed to be operational in time for the fall harvest. With both the Coop and CIE in dire financial straits, allowing Nostaw and Green Lion to litigate their payment dispute while the grain handling facility sat uncompleted would have resulted in an inability to generate revenue paired with a massive accumulation of debt through accumulated interest. Thus, the Coop had a strong interest in completing the grain handling facility as soon as possible, and Nostaw, with its experience and equipment on-site, was in the best position to achieve that goal.

The Trustee's argument that the September Agreement was for work already performed by June 12, 2007, is unsupported by the record. Nostaw's deposition testimony was consistent with the invoices, which indicated that note was for work yet to be performed by Nostaw (the "balance to finish"). Similarly, the Trustee's argument that the Green Lion note was not yet due at the time the Coop and Nostaw entered the September Agreement is misplaced. Although the Green Lion note was not due for 17 more days, Green Lion had already expressed its intent not to pay and refused to provide Nostaw with further assurances of payment. Thus, Nostaw was "reasonably certain that the other party [was] not going to meet its obligations under the contract in timely fashion." *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 919 (7th Cir. 2001). In other words, Green Lion was in breach of its contractual obligations. Finally, the Trustee fails to address the Bankruptcy Court's holding that the Trustee is barred from challenging September Agreement for lack of consideration because both parties had performed their duties under the contract before the bankruptcy petition was filed.

### (3) The Trustee is Unable to Establish that the Coop did not Receive Reasonably Equivalent Value

Illinois courts have not definitively interpreted "reasonably equivalent value" under the IUFTA, but they have defined what it is *not*—a transfer lacks reasonably equivalent value if there is no consideration or inadequate consideration. *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 946-47 (7th Cir. 2007) (citing *Regan v. Ivanelli,* 246 Ill.App.3d 798, 804, 187 Ill.Dec. 351 (1993)). However, because the IUFTA is a uniform Act, courts may look to cases decided under 11. U.S.C. § 548 and to cases interpreting other states' versions of the UFTA to determine the meaning of reasonably equivalent value. *Jumer*, 472 F.3d at 947. The Seventh Circuit has articulated a test to determine reasonably equivalent value in the context of a fraudulent conveyance under § 548 as requiring "the court to determine the value of what was transferred and compare it to what was received." *Id.* (quoting *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir. 1997)).

Here, it is unnecessary to determine whether the Coop's transfers to Nostaw under the September Agreement were for reasonably equivalent value because the Trustee did not seek to avoid the obligation as constructively fraudulent and the time for doing so has long since passed. See *In re Incentium, LLC*, 473 B.R. 264, 272 (Bankr. E.D. Tenn. 2012). Since the Trustee was barred from challenging the September Agreement under a fraudulent transfer theory, it was confined to challenging the Agreement on the grounds that it was unenforceable for lack of consideration. See *In re Central Illinois Energy Co-op*, 526 B.R. at 792, citing *In re Derivium Capital LLC*, 716 F.3d 355, 367 (4th Cir. 2013) As discussed above, the September Agreement represented a valid and enforceable bilateral contract between the Coop and Nostaw. The Coop promised payment to Nostaw in exchange for Nostaw's promise to complete the construction of the grain handling facility. Thus, the mutual exchange of promises represented valuable

consideration. *Dohrmann v. Swaney*, 2014 IL App (1st) 131524. Further, because the payments made to Nostaw were in satisfaction of an enforceable, unavoidable obligation, the transfers were for reasonably equivalent value as a matter of law. *In re All–Type Printing, Inc.*, 274 B.R. 324 (Bankr. D.Conn. 2002)

## CONCLUSION

For the reasons stated above, the Court Affirms the Bankruptcy Court's November 2014 Order and Opinion and March 2015 Affirmance.


Entered this 25th day of January, 2016

s/ James E. Shadid<br>
James E. Shadid<br>
United States District Judge